IN OPEN COURT

DEC – 4 2018

CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | Criminal No. 1:18-CR-446 |
| v. | ) | |
| | ) | Count 1: 18 U.S.C. § 1343 |
| BRIAN THOMAS SAPP, | ) | (Wire Fraud) |
| | ) | Count 2: 18 U.S.C. § 1028A(a)(1) |
| Defendant. | ) | (Aggravated Identity Theft) |
| | ) | |
| | ) | Forfeiture Notice |

INFORMATION

Count 1

(Wire Fraud)

THE UNITED STATES ATTORNEY CHARGES THAT:

At all times relevant to this Information:

1.      Defendant BRIAN THOMAS SAPP (hereafter "SAPP" or "the defendant")
resided in Alexandria, Virginia, located within the Eastern District of Virginia.

2.      Beginning in or around 2012, SAPP founded, operated, and controlled various
entities related to real estate investment, among them: Novus Home Buyers; Novus Marketing;
Novus Acquisitions; and Novus Properties, LLC (hereafter "Novus"), which was the primary
entity SAPP used to execute the scheme to defraud, described below.

3.      Novus is a limited liability company organized under the laws of the
Commonwealth of Virginia, with its principal office on Mt. Vernon Avenue, in Alexandria,
Virginia.

4.      Novus maintained bank accounts at Navy Federal Credit Union and at Capital One Bank, both financial institutions within the meaning of Title 18, United States Code, Section 20. SAPP also maintained personal accounts at these banks.

5.      Beginning no later than in or around June 2014, SAPP began to solicit investors to provide funds to Novus Properties, LLC, to be used in what he described as wholesale purchases of lender-owned, distressed residential real properties—typically single-family homes—located in communities in the Eastern District of Virginia, as well as in Maryland and the District of Columbia. SAPP claimed that he had developed business relationships with asset managers at banks and mortgage lenders, which provided him and Novus with a competitive advantage in locating and purchasing undervalued bank-owned or otherwise distressed properties. SAPP also represented that he had pre-arranged buyers to purchase the homes from Novus at a higher price, after Novus would hold the property for ninety (90) days in order to satisfy Federal Housing Authority regulations. According to SAPP, the resale of the properties would yield a profit to Novus that SAPP would share with investors. Typically, SAPP promised to repay investors their principal plus up to a 25% return on investment within 120 days. SAPP also offered investors the option to roll-over and reinvest the principle and profits, along with additional infusions of principle, for use in further profitable property flips.

6.      Rather, as described further below, for each of the hundreds of fraudulent transactions involving Novus for the period 2014 to 2018, SAPP created a sophisticated set of interlocking false and fraudulent documents that included forged signatures of real persons who were the purported sellers and buyers of the properties that Novus was flipping. Rather than using investor funds as promised, SAPP used the funds, for among other things:

2

a) to pay his personal expenses, which included frequent dining out, business travel, purchase of a Mercedes vehicle, and golf vacations;

b) to reinvest in the scheme through, among other means, the production of sophisticated marketing materials; renting office space for Novus; paying Novus' employee salaries; creating a presence on the internet; and,

c) as needed, to lull investors into believing the scheme was working as promised, by making periodic payments to them.

7.     To achieve all of this, SAPP, continually solicited new investors and pitched existing investors to infuse Novus with additional funds.

8.     SAPP used later investor funds to make payouts to earlier investors, as well as to pay the expenses described above, rather than for the stated purpose of the investments.

9.     SAPP, a former Eagle Scout, primarily targeted investors who were long-time personal friends (and family members of those friends) who trusted SAPP. For instance, SAPP had been the best man at one investor's wedding years before. Victims resided in the Commonwealth of Virginia, the States of Maryland, Pennsylvania, New Jersey, and elsewhere. Altogether, SAPP successfully solicited at least 21 victims, and caused over $1,400,000 in out-of-pocket losses to those victims. Some victims cashed out retirement funds and home equity lines of credit to invest with SAPP and have suffered substantial financial hardship as a result of SAPP's misrepresentations.

10.     From June 2014 and continuing through approximately April 2018, as part of the scheme and artifice to defraud and in furtherance thereof, SAPP generated various transactional documents for each purported property purchase by Novus for subsequent resale, including the following:

3

a) A "Guaranty Agreement" between Novus and investors funding the property flips that specified, among others, the following terms: the date and the amount of investment, which was often characterized as a loan; the return on investment stated as a percentage of the principal amount invested, which varied over time but went as high as 25%; the due date for Novus to repay, which was typically 120 days; and Novus' promise to repay and enforceability of the Guaranty Agreement. Many of the Guaranty Agreements identified the specific real property purchase toward which the investor's funds were to be applied.

b) A "Joint Venture Agreement" and a "Contract Specific Agreement" purportedly between Novus and the entity purchasing the distressed properties that Novus supposedly acquired approximately ninety days earlier from banks. In executing this part of the scheme to defraud, SAPP misappropriated the entity name of Zelaya Homes LLC, and used the full name of that entity's principal officer, identified here as J.Z., without lawful authority, and forged the signature of J.Z. on hundreds of such agreements, in order to mislead investors into believing that he had a legitimate buyer for the distressed properties he was supposedly purchasing from banks.

c) A HUD-1 Settlement Statement cover letter purportedly from Capitol Title Insurance Agency, Inc. that affirmed the supposed contract sales price and settlement terms of a specific home supposedly purchased by Novus from a bank or mortgage lender. As part of the scheme to defraud, SAPP created these documents and forged the purported seller's signature.

4

11.     In furtherance of the scheme, SAPP would also create and then send via email financial projections to investors showing the anticipated profits on specific properties he was proposing that Novus would buy (and later sell) using investor funds.

12.     SAPP would almost always provide the Guaranty Agreement to investors via a cloud-based document signing system called DocuSign, whose servers were at all times located outside the Commonwealth and Eastern District of Virginia. None of the victims resided within a state where DocuSign maintained its servers. SAPP and investors would access DocuSign from their given physical locations via the internet, with SAPP typically logging in via smartphone or computer remotely from Alexandria, Virginia, or Arlington, Virginia. DocuSign would log the internet protocol ("IP") address of SAPP and the investors for each agreement that SAPP and his investors electronically signed.

13.     In furtherance of the scheme, SAPP would also use DocuSign to affix his own digital signature for Novus as seller, and without lawful authority the digital signature of victim J.Z., on the Contract Specific Agreement for each property supposedly purchased by Novus that was to be resold to Zelaya Homes LLC. SAPP would use the same internet protocol address to sign for himself and for J.Z. within minutes of each other. In furtherance of the scheme, SAPP used the email address phatsapp@yahoo.com to access DocuSign links while using the identity of victim J.Z., a real person known to him. After signing as J.Z., SAPP would then electronically forward a copy of the Contract Specific Agreement to investors as evidence that the property had a buyer, in order to induce investors to part with money.

14.     As part of the scheme to defraud, at first, and especially with new investors, SAPP would promptly repay the initial investment and the promised interest. Very quickly, SAPP would propose additional investments to the victim he had just paid. Based on the

perception of the easy profits readily in hand and the promise of more to come, investors would often promptly reinvest the principal and interest with Novus at SAPP's behest. By constantly putting money back into Novus, many investors never actually retained the apparent profits that SAPP was paying them.

15.     In making his materially false representations and promises to victims in furtherance of the scheme, SAPP would communicate with potential investors in person, over the interstate telephone wires, and via interstate email and text messages. In addition to the representations detailed in Paragraphs 5 of this Information, above, SAPP claimed to investors that Novus was a safer investment than the stock market. SAPP also claimed that he was "killing it" and "dominating" the real estate market. At the time he made these statements to investors, SAPP was, in fact, not closing on any of the promised deals.

16.     In or around January 2018, SAPP began having trouble making payments to investors. In an effort to conceal the crime, in or around March, 2018, SAPP sent two investors a screen shot of a supposed deposit from a title company in excess of $600,000. In reality, SAPP had fabricated the document and there was no such deposit. In or around early April 2018, SAPP continued to make excuses for the purpose of concealing the scheme to defraud.

17.     Beginning not later than in or around June 2014, and continuing through at least in or around April 2018, in the Eastern District of Virginia and elsewhere, Defendant BRIAN THOMAS SAPP, knowingly devised and intended to devise a scheme and artifice to defraud investors and to obtain money from them by means of materially false and fraudulent pretenses, representations, and promises, through the use of the interstate wires, to wit: on or about June 16, 2017, within the Eastern District of Virginia and elsewhere, and for the purpose of executing such scheme and artifice to defraud and attempting to execute such scheme, the defendant did

6

knowingly transmit and cause to be transmitted writings, signs, signals, and sounds by means of wire communications in interstate and foreign commerce, to wit: the defendant logged into DocuSign and electronically signed a Guaranty Agreement with victims D.K. and O.R. regarding Novus' supposed purchase of a real property located on Carriage Hill Drive, Laurel, Maryland 20707.

(All in violation of Title 18, United States Code, Section 1343.)

Count 2

(Aggravated Identity Theft)

THE UNITED STATES ATTORNEY FURTHER CHARGES THAT:

18.     The allegations set forth in paragraphs 1 through 17 of this Information are realleged and incorporated as if set forth herein.

19.     On or about the 16th day of June, 2017, in the Eastern District of Virginia and elsewhere, defendant, BRIAN THOMAS SAPP, did knowingly possess and use without lawful authority a means of identification of another person, to wit, the name and digital signature of a victim identified here as J.Z., during and in relation to a felony enumerated in 18 U.S.C. § 1028A(c)(5), wire fraud, knowing that the means of identification belonged to another actual person.

(All in violation of Title 18, United States Code, Section 1028A(a)(1).)

8

## FORFEITURE NOTICE

THE UNITED STATES ATTORNEY FURTHER ALLEGES THAT THERE IS PROBABLE CAUSE THAT THE PROPERTY DESCRIBED BELOW IS SUBJECT TO FOFEITURE:

1.      Pursuant to Federal Rule of Criminal Procedure 32.2(a), Defendant BRIAN THOMAS SAPP is hereby notified that, if convicted of an offense alleged in Count 1 of this Information, the Defendant shall forfeit to the United States, pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), his interest in any property, real or personal, constituting or derived from proceeds obtained directly or indirectly as a result of the conviction on Count 1.  If property subject to forfeiture cannot be located, the United States will seek an order forfeiting substitute property, including but not limited to the following:

   a.   A sum of money equal to at least $1,454,672 in United States currency, representing the amount of proceeds obtained as a result of the offense in Count 1.

(In accordance with Title 18, United States Code, Section 981(a)(1)(C); Title 28, United States Code, Section 2461(c); and Rule 32.2(a), Federal Rules of Criminal Procedure.)

G. Zachary Terwilliger
United States Attorney

By:_____
Russell L. Carlberg
Special Assistant United States Attorney (LT)