IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | Criminal No: 1:18-cr-446 |
| | ) | |
| BRIAN THOMAS SAPP, | ) | The Honorable Anthony J. Trenga, |
| | ) | Sentencing:  March 15, 2019 |
| Defendant. | ) | |

## POSITION OF THE UNITED STATES WITH RESPECT TO SENTENCING

In accordance with Title 18, United States Code, Section 3553(a), Rule 32 of the Federal Rules of Criminal Procedure, and Section 6A1.2 of the United States Sentencing Commission, Guidelines Manual (Nov. 2018) ("U.S.S.G." or "Guidelines"), the United States of America files this Position with Respect to Sentencing Factors in the instant case.

The United States has reviewed the Presentence Investigation Report ("PSR") and the computations of the United States Probation Officer ("USPO").   The United States has no objections to the PSR and agrees that the computations and calculations were correctly made. Defendant Brian Thomas Sapp ("Sapp" or "the defendant") is a criminal history category I.  The total offense level for Count 1 of the Information (Wire Fraud) was properly calculated at 28 (after acceptance of responsibility), resulting in an advisory sentencing guidelines range of 78 to 97 months in prison for Count 1. Because the defendant also pleaded guilty to Aggravated Identity Theft (Count 2), he will face a 24 month mandatory minimum sentence that will run consecutive to any sentence the Court imposes on Count 1. Due to the length of time the defendant preyed on his closest friends, and all the damage he caused, the United States believes that **a sentence of 108**

**months** (84 months for the Wire Fraud and 24 months for the Aggravated Identity Theft) is appropriate in this case in order to satisfy the statutory sentencing factors discussed below.[1]

## I.      Background and Offense Conduct

The defendant concocted a sophisticated scheme to defraud his closest friends and their families. PSR ¶¶ 14, 50.  He proposed they finance his entity, Novus Properties, in its purchase of distressed single family homes, which he would then resell approximately 90 days later at a profit. *Id*. at 13.  Not even one of the first deals ever worked out, yet the defendant immediately lied to his victims to keep the money rolling in. *Id*. at 32.  He kept on lying for over four years. In the end, the defendant caused over $1.8 Million in actual losses to more than 20 victims, inflicting substantial financial and emotional harm in the process.  *See* PSR ¶¶ 36, 41-49.

By the defendant's own admission, as early as 2013, he took in $20,000 from a close friend, M.M. Jr., for a proposed residential real estate property flip, but, instead, used M.M. Jr.'s money to pay off his own debts.  PSR ¶ 29.  The defendant immediately lied to M.M. Jr. about the success of the flip, encouraging M.M. Jr. to roll over his investment into other supposed property flips.  *Id*. The "success" of the defendant's property flips encouraged M.M. Jr. to tell his father and other close friends about the defendant's expertise and ability to generate profits on a deal-by-deal basis. PSR ¶ 37.  Soon, the defendant was presenting his scheme to other close friends and their families. *See* PSR ¶¶ 30, 38.  The allure of the defendant's scheme was that, with boyish enthusiasm, he personally assured his victims it was "low-risk" and that he had a guaranteed buyer lined up on the other side of each supposed property flip.  PSR ¶¶ 13, 45. The defendant chose his victims

---

[1] As detailed in attached Proposed Orders, the United States seeks an order of forfeiture in the amount of $1,802,980, and a restitution order of $2,311,330.12, for the victims in this case.

carefully, selecting those with whom he had close personal relationships, who would be inclined to trust him and not to question him too closely.  *See* PSR ¶¶ 41-48, 50.

But the scheme was not built solely on the exploitation of personal trust and the concomitant betrayal.  It also required the defendant to expend substantial time and expertise to create the trappings of a successful business.  In other words, the scheme was the defendant's full-time vocation for years. *See e.g.* T.H. and L.H. Victim Impact Statement at p. 2 ("[t]he scam was the entire business"); D.K. Victim Impact Statement at p. 2 (describing "carefully orchestrated deception" involving the documents); *see also* PSR ¶ 32 (defendant's admission that he never closed on a single real transaction for his investors).

To execute the scheme, the defendant researched actual homes for sale on the market in the District of Columbia, Maryland and Virginia (colloquially, "the DMV"), obtaining the addresses and the names of the sellers.  He then concocted imaginary profit analyses based on the purchase and resale of each property.  Next, the defendant created a "Guaranty Agreement" showing that his entity, Novus Properties, was purchasing the homes from the seller and the home would be security for the investors' funds. *See* **Exhibit 1 (Guaranty Agreement)**.  He used the real names and addresses of the real people and their properties in the supposed sales to Novus.  PSR ¶ 14.  The defendant used both a digital signature generator, and sometimes other means, to forge the homeowners' signatures on each of hundreds of fake HUD-1 Settlement summaries from a title company, each purporting to show the sale of the homes to Novus.  PSR ¶¶ 14, 35; *see also* **Exhibit 2 (HUD-1 Settlement Summary Example)**.  In this part of the scheme alone, literally hundreds of residents of the DMV unwittingly had their names misappropriated and signatures forged by the defendant, as did banks and other institutional sellers.

But it not end there.  To complete each supposed flip, the defendant also created a set of documents showing the resale of the property to an investor — again a real company, usually the company owned by the Alexandria homebuilder identified here as "J.Z." *See* **Exhibit 3 (Joint Venture and Contract Specific Agreement)**.  Without J.Z.'s knowledge or approval, the defendant stole J.Z.'s identity to set up an account on DocuSign, whereby the defendant would log in as J.Z. and digitally forge J.Z.'s name to hundreds of contracts, each purportedly showing J.Z.'s company purchasing the homes that Novus was selling — of course, at a profit to Novus.  PSR ¶¶ 14, 17.  The defendant would email copies of the fraudulent transactional documents to his victims in order to induce them to wire him money. *Id*. at ¶¶ 15, 35.

As part of the scheme, the defendant spent substantial face-time with his victims, bragging about his prowess as a businessman, claiming that he was "killing it," "crushing it" and "dominating" the market. PSR ¶ 44.  Each one of these statements was a lie.

The defendant also spent substantial sums of the victims' money on golf trips, expensive meals, and the other trapping of his supposed success. *Id*. at ¶¶ 19, 34.  For instance,  the defendant purchased a Mercedes van with investor funds, then spent another $40,000 of investor money customizing the van with an high-end satellite TV system and other equipment so that he could host elaborate tailgating parties at Penn State football games. PSR ¶ 34. There, he ate and drank in the very company of his victims. *See* PSR ¶ 34; D.K. Victim Impact Statement at p. 3. **Exhibit 4 (Customized Mercedes Van)** shows the defendant with the Mercedes van, being interviewed by a local television station apparently because his tailgating spread was so lavish.  The custom satellite roof-top antenna, the flat screen TV, the high-end tent and the professional grilling

equipment and serving stations pictured in Exhibit 4 were all purchased with investor funds.[2] Because he had no source of income other than the scheme, and he never closed a deal for his investors, the defendant was, in fact, always spending the victims' principal investment funds—in many cases their retirement funds, home equity, and children's college savings—on himself.

The defendant also spent investor money on a glossy prospectus highlighting his successes and offering money for investor referrals. *See* **Exhibit 5 (Novus Prospectus)**. Later in the scheme, he produced a lengthier investor deck that included specific material misrepresentations as to Novus's historical profitability and success for 2015-2017, falsely representing over $1.5 million in revenue from property flips. *See* **Exhibit 6 (REO Investor Deck – selected pages)**. The real number was zero. The defendant also had a website, maintained offices and employees, all as part of the fraud.

Because the defendant never closed on a transaction for his investors over the course of more than four years, he had to use new investor money to make periodic payments to earlier investors, each time falsely representing that the payments represented profits from a successful property flip. PSR ¶¶ 31-32. The defendant's other method of avoiding repayment of investor money was to convince investors' to roll-over their "profits" into new transactions. *Id*. at ¶¶ 13, 33. In the case of the two victims who controlled KrazRock Group, LLC, the defendant usually paid the purported profits and principal on the deals, but immediately proposed new deals, which the victims then agreed to finance, thereby transferring additional funds back to him. That is why the defendant took in over $7 Million from KrazRock Group, LLC, alone, victimizing them for a

---

[2] When FBI agents confronted the defendant in the hope of recovering at least some money for victims, they advised him not to sell or otherwise encumber the van. PSR ¶ 34. The defendant promptly disregarded that admonition and sold the van, dissipating the last of investor funds. *Id*.

total of $634,986, by the time the scheme collapsed.  That also caused these victims to pay substantial taxes on the imaginary profits Sapp reported to them. PSR ¶¶ 38, 49.

The defendant's betrayal of his closest friends has left permanent scars on his victims' psyches, to say nothing of their financial positions. Victims T.H. and L.H. described the defendant as one of their "best friends." PSR ¶ 43.  In the words of T.H., "[i]n addition to the financial hardship this has caused, the fact that I held Brian in such high regard as a friend compounds the financial injury with personal insult." T.H. Victim Impact Statement at p. 1.

Victim R.J. had told the defendant that he was investing his retirement funds and was reassured by Sapp's claim that the investment was low-risk.  The defendant played on his personal relationship to R.J.'s spouse to overcome R.J.'s reluctance to invest.  R.J. Victim Impact Statement at p. 1.  As a result of the fraud, R.J. wrote that "[t]here isn't a day that goes by that something doesn't trigger the anxiety and anger that Mr. Sapp has caused me." *Id.*

Victim M.M. Sr., writes that his son, M.M. Jr., who had been roommates and close friends with the defendant, and a result of his trust in the defendant had recommended the defendant's investment to his own family and friends, has been left "completely devastated" and lost confidence in himself. M.M. Sr. Victim Impact Statement at p. 2; PSR ¶ 47.  Victim M.Y. stated that, "I have been hurt and left to feel stress in my own personal relationship and outright shame." M.Y. Victim Impact Statement at p. 1.

Victim D.K. described the defendant as a "brother," even favoring the defendant over his own two biological brothers as the best man at his wedding. PSR ¶46; D.K. Victim Impact Statement at p. 1. Yet, the defendant mercilessly victimized D.K. and his business partner, O.R., over 237 times, year-over-year.  D.K. Victim Impact Statement at p. 1.  Victims D.K. and O.R. had explained directly to the defendant that they were pulling money out of personal savings and

home equity, yet the defendant pressed them to invest in further deals, and requested them to assist

in bringing him new investor referrals from their work circle, thus attempting to expose them to

even greater collateral risks. *Id.* at p. 2.[3]   Victim D.K. summarized the overall toll the defendant's

betrayal has had upon him:

> Over and above the massive financial harm that Brian has caused, he has also
> wreaked tremendous emotional havoc on me and my family. Uncovering a betrayal
> of this magnitude at the hands of someone whom we trusted so deeply has damaged
> me at my core. In the weeks and months following his admission, I couldn't sleep.
> I couldn't eat. I was completely broken by the traumatic breach of trust … All of
> this has impacted my personal and professional interactions as well as my general
> outlook on the world at large. I suspect it will take a very long time before I can
> regain my footing.

*Id.* at p. 3.

Sapp, with no children of his own to support, and no colorable excuse for his fraud (e.g.,

no sick parent or child to support), chose to steal from D.K. and O.R., both of whom had small

children at home. *Id.* at p. 3.  Most poignantly, D.K. vividly describes the impact of the defendant's

crime on his family following the birth of his daughter:

> Lastly, the culmination of our discovery of Brian's misrepresentations occurred just
> two weeks after the birth of my daughter. Beyond the substantial amount of money
> Brian stole from my family, he robbed pure joy from what should have been one of
> the happiest times of our lives. We cannot reclaim those days and there's no price
> to put on their loss.

*Id.* at 3.

The defendant even found a way to victimize and potentially compromise another of his

closest friends, one who did *not* invest with him.  Victim R.N. described the defendant as his best

friend since the seventh grade, for 27 years, writing: "I loved him like a brother, sharing more of

---

[3] Thankfully, D.K. and O.R. were very fortunate in not recruiting others for Sapp's investments.
That could have led to serious career ramifications for them once the scheme collapsed, as their
professional colleagues would also have been left with significant losses. This order of
consequences was something to which the defendant, lost in self-regard, was either completely
oblivious or, more likely, totally indifferent.

my life with him than my own blood brother." *See* R.N. Victim Impact Statement at p. 1.  R.N. and his wife even named Sapp the guardian of their children, in the event they should die.  *Id*. at p. 5.  Sapp, knowing that his entire business was a sham, nevertheless persistently encouraged R.N. to quit a stable, high-paying job, to work for Novus.  PSR ¶¶ 41, 48.  Toward the end of the scheme, when Sapp was already having trouble making Ponzi payments, he promised R.N. that Novus would match R.N.'s existing six-figure salary.  *Id*. at ¶ 48.  That was also a lie.

R.N.'s trust in the defendant led him and his family to suffer serious financial losses due to his decision to quit his job and work for Novus. After cashing out their retirement account, they even had to retain a criminal defense attorney to make sure that R.N. did not inadvertently and unfairly get caught up in the defendant's wrongdoing. *See* R.N. Victim Impact Statement at pp. 9-10. The same is true of at least one other victim in this case – part of the collateral consequences of the defendant's crimes.

Finally, the government has investigated the defendant thoroughly.  The defendant's claim that he had a legitimate "seller direct" business he was funding by stealing from his investors, *see* PSR ¶¶ 34, 52, or that any portion of his $60,000 per year Novus "salary" was "legitimate, *id*. at ¶ 94, is total fantasy – unless one counts attending expensive wealth-building seminars and bloviating over golf matches as a real business or a job.  Because Novus was entirely a fraud, not a penny of the defendant's salary was "legitimate."

## II.    Guidelines Calculation

The Fourth Circuit has held that a sentencing court must: "(1) properly calculate the [Sentencing] Guidelines range; (2) allow the parties to argue for the sentence they deem appropriate and determine whether the § 3553(a) factors support the sentence[s] requested by the parties; and (3) explain its reasons for selecting a sentence." *United States v. Simmons*, 269 Fed. Appx. 272, 273 (4th Cir. 2008) (*citing United States v. Pauley*, 511 F.3d 468, 473 (4th Cir. 2007)).  Although the Sentencing

Guidelines are advisory, *United States v. Booker*, 543 U.S. 220, 246 (2005), "district courts must begin their analysis with the Guidelines and remain cognizant of them throughout the sentencing process." *Gall v. United States*, 552 U.S. 38, 50 n. 6 (2007); *see Rosales-Mireles v. United States*, 138 S. Ct. 1897, 1904 (2018) ("[E]ven in an advisory capacity the Guidelines serve as 'a meaningful benchmark' in the initial determination of a sentence and 'through the process of appellate review'") (citation omitted). For the reasons stated below, the USPO properly calculated the total offense level at 28 (after acceptance of responsibility).

A. *Base Offense Level and Loss Amount*

The USPO correctly found that the total loss was **$1,804,180**, and therefore applied a 16 level enhancement on top of the base offense level of 7, under § 2B1.1(b)(1)(I). The amount of loss is to be determined by a preponderance of the evidence. *United States v. Miller*, 316 F.3d 495, 503 (4th Cir. 2003). The Court may consider relevant information "without regard to its admissibility under the rules of evidence applicable at trial" for sentencing purposes. U.S.S.G. § 6A1.3(a).

The Application Notes for § 2B1.1 states unequivocally that, in determining loss under § 2B1.1(b)(1), "loss is the greater of actual loss or intended loss." U.S.S.G. § 2B1.1, cmt. 3(A). Intended loss "includes intended pecuniary harm that would have been impossible or unlikely to occur." *Id.*, cmt. 3(A)(ii); *Miller*, 316 F.3d at 498-503 (rejecting "likely or possible" test). The Court need only make a reasonable estimate of loss. 18 U.S.C. § 3742 (e) & (f); USSG § 2B1.1, cmt. 3 (C). In the case of a Ponzi scheme, the defendant receives no credit or offset for over-payments (or gains) received by some investors. USSG § 2B1.1, cmt. 3(F)(iv).

Here, the FBI financial analyst has examined all of the relevant bank records, has reconciled them against the records that the defendant and the victims provided, and has determined that the out-of-pocket loss as to the victims in this case is **$1,804,180**. The Probation

Officer has likewise conducted her own review of the evidence and concurs with this loss figure. *See* PSR ¶¶ 49, 55.

With respect to the handful of victims recruited by M.M. Jr., it is clear that their losses were foreseeable and caused by the defendant.  The government has interviewed M.M. Jr., and has obtained evidence and statements from each of the victims he recruited for the defendant's scheme. The defendant was aware that M.M. Jr. was recruiting investors and that much of the money M.M. Jr. sent him was investor money.  Moreover, the defendant knew of, and in some cases personally met, the investors M.M. Jr. had recruited.  According to the FBI financial analyst, all of the money that M.M. Jr. raised from victims went to the defendant for the scheme. Because M.M. Jr. also invested his own money and believed he was entitled to take certain profits in reliance on the misrepresentations of the defendant, M.M. Jr. himself took distributions and personally was a net winner at the time the scheme came to halt.  Other victims reinvested more with the defendant, and when the scheme collapsed, they were left holding the bag. That is why the total loss attributable to the victims recruited by M.M. Jr. is foreseeable and caused by the defendant, even if a portion of their loss might in, say, a separate civil proceeding, be considered joint and several.

In any event, we know that the loss calculation of +16 is correct, and is in no event less than that.  The Fourth Circuit has stated that in Ponzi scheme cases the loss measurement is the total amount of money taken in by the scheme, with no credit for Ponzi payments.  *See United States v. Loyaza*, 107 F.3d 257, 266 (4th Cir. 1997).  So, even were the losses to the victims that M.M. Jr. recruited to be eliminated, the total amount of money brought in by the scheme would still far exceed the $1.5 Million threshold, and the +16 level enhancement would easily apply.

B.      *Substantial Financial Hardship to Five or More Victims*

At the time of the defendant's guilty plea, it was clear there were more ten victims under

§2B1.1(b)(2)(A), for the +2 level enhancement.  Now, after receiving the victim impact statements,

it is also clear that five or more victims suffered substantial financial hardship, and accordingly,

+4 levels are appropriately added under §2B1.1(b)(2)(B), for the reasons stated below.

Application note 4(F) to subsection (b)(2) provides that courts shall consider, among other

factors, whether the offense resulted in the victim: (i) becoming insolvent; (ii) filing for bankruptcy

under the Bankruptcy Code; (iii) suffering substantial loss of a retirement, education, or other

savings or investment fund; (iv) making substantial changes to his or her employment, such as

postponing his or her retirement plans; (v) making substantial changes to his or her living

arrangements, such as relocating to a less expensive home; and (vi) suffering substantial harm to

his or her ability to obtain credit. U.S.S.G. § 2B1.1, cmt. 4(F).  These factors are non-exhaustive.

This guideline was added in 2015 so that sentencing courts would "place greater emphasis on the

extent of harm that particular victims suffer as a result of the offense" and such enhancement would

meet the "overall goal of focusing more on victim harm."  *Sentencing Guidelines for the United*

*States Courts*, 80 Fed. Reg. 25.782-01, 25791, 2015 WL 1968941 (May 5, 2015).

Courts that have considered this enhancement have held that even apparently small losses

can create substantial financial hardship to victims, depending on the situation of the victim.

Losses as low as $2,000 for victims who are working class and will take years to recover from the

fraud have been affirmed as causing substantial financial hardship.  *United States v. Minhas*, 850

F.3d 873, 867-79 (7th Cir. 2017).  Indeed, losses as low as $400-$800 per victim have been upheld

as the basis for substantial financial hardship when it creates missed rent and utility payments or

other stressors for victims.  *United States v. Castaneda-Pozo*, 877 F.3d 1249, 1253 (11th Cir.

2017).  As the Eleventh Circuit explained, "[a]lthough each victim's pecuniary loss may not seem great, Castaneda–Pozo's actions made his victims insecure in life's basic necessities—housing, electricity, water, and food. Certainly that insecurity is sufficient to raise a substantial hardship, and the district court therefore did not clearly err." *Id.*  Loss of savings and postponing retirement clearly qualify under the guideline.  *United States v. Brandriet*, 840 F.3d 558, 561-62 (8th Cir. 2016).  The Third Circuit recently upheld the substantial harm enhancement for more than five victims, most of whom had lost between $9,500 and $16,000 each, because of impacts on savings, changes in retirement plans, and a victim's need to work a second job as a result of the fraud. *United States v. Poulson*, 871 F.3d 261, 271-72 (3d Cir. 2017).

Here, the Probation Officer has carefully considered the financial losses that the defendant inflicted and the actual effects on victims as detailed in their statements to the Court.  Paragraph 49 of the PSR describes the losses and how victims T.G. ($24,250 loss), R.J. ($20,000 loss), D.K. ($535,564.14 loss), O.R. ($532,184.54 loss), J.W. ($19,759 loss), R.N. ($75,587.44), M.L. and C.L. ($100,000) and M.M. Sr. ($157,950 loss) suffered substantial losses of retirement, education funds, and home equity.  This list does not include all of the victims or their spouses.  Some victims had to change retirement plans, take on extra work, or delay home repairs and other planned events in their lives.  The substantial and articulated losses of more than nine victims easily satisfies the enhancement for substantial financial harm.

### C.    Sophisticated Means

The Probation Officer is correct that the defendant ran a sophisticated scheme. Accordingly, she has appropriately applied a +2 level enhancement under §2B1.1(b)(10)(C).  As described in the PSR and the Statement of Facts, the defendant used a sophisticated set of interlocking transactional documents to simulate real estate purchases and sales in order to induce

his victims to part with money. PSR ¶¶ 14-15, 17.  As victim D.K. explained, he and his business

partner, O.R., did not "broker on trust alone," but sought documentation for each deal in order to

verify the deals before they would transfer money to Sapp:

> … we requested additional documentation (HUD-1 & Property Sales Agreements)
> from his as "proof" that he was, in fact, investing our money in real property. He
> willingly provided the additional proof per transaction, thousands of pages in total.
> We know now from his admission, that every page was painstakingly fabricated
> and all of the official seals, letterhead, and the hundreds of signatures of bank
> employees and home buyers contained therein were forged by Brian.

D.K. Victim Impact Statement at p. 2.  And when Sapp had trouble repaying D.K. and O.R., he

created fake bank statements and sent screen shots to prove he still had the victims' funds. *Id.*

This is precisely the type of multilayered sophistication that the Fourth Circuit has found to satisfy

the sophistication enhancement.  *See United States v. Davis*, No. 18-4080, 2018 WL 5096070, at

*1 (4th Cir. Oct. 18, 2018) (unpublished) (affirming application of the sophisticated means

enhancement applies where the defendant created a "multilayered scheme" and "used numerous

means to conceal the fraud, including forgery, altering documentation, transferring money between

accounts, and omitting property from certain accountings"). Exhibits 5 and 6 also show the

sophistication of the defendant's marketing materials.

> **D.    Abuse of Position of Trust and Use of Special Skill**

The Probation Officer correctly applied the +2 level enhancement under §3B1.3 for abuse

of position of trust and use of special skill. Not only did the defendant use his superior knowledge

of the local real estate market, and his skills with computers, to make his scheme plausible in the

eyes of the victims, but he cultivated and abused persons closest to him, with whom he had deep,

pre-existing relationships. The Fourth Circuit, in applying the enhancement to a defendant,

explained its reasoning as follows:

> Overall, the question of whether a defendant held a position of trust must be approached from the perspective of the victim. *United States v. Moore*, 29 F.3d 175, 179–80 (4th Cir.1994). Because the inquiry requires a "sophisticated factual determination," a trial court's finding will be reversed only if clearly erroneous. *United States v. Helton*, 953 F.2d 867, 869 (4th Cir.1992).

*United States v. Gordon*, 61 F.3d 263, 269 (4th Cir. 1995).

"From the perspective of the victims," *id.*, it is abundantly clear that many held the defendant in the highest personal regard. These were not mere passing acquaintances or casual friends. Rather, the defendant was so close to the victims in this case that many referred to him as a "brother." Two separate victims (R.N. and D.K.) honoured the defendant over their own biological brothers as the best man in their separate weddings. The defendant was a friend of 27 years, the "best friend" and the "roommate" of other victims. The defendant preyed upon these close relationships, and he leveraged those friends to bring in their wives, family members, and their circle of friends to invest in his scheme. *See* PSR ¶¶ 41-48, 50.

The Seventh Circuit has noted that the cultivation of prior relationships for use in executing a fraud scheme constitutes abuse of trust under the guideline. *See United States v. Burke*, 125 F.3d 401, 406 (7th Cir. 1997) ("[w]hat is relevant is whether Burke relied on the relationships he previously had established with those three victims to further his fraudulent securities scheme. If Burke did create a relationship of trust with customers from his sales for the AART, and then abused that trust in order to sell his fraudulent securities, then the district court properly enhanced his sentence under § 3B1.3."). Courts routinely apply the enhancement to those who abuse "pre-existing relationships" such as friendships and familial relations in the service of a fraud scheme. *United States v. Pacheco-Martinez*, 791 F.3d 171, 179 (1st Cir. 2015) (perpetrator a "family friend" who also familial relations among victims); *United States v. Mabrook*, 301 F.3d 503, 510 (7th Cir. 2002) ("Mabrook relied on at least one close and long-term friend, Dr. Rahim, to invest

in his fraudulent scheme. Therefore, with respect to Dr. Rahim, Mabrook was not engaged in an arms-length transaction; rather he used his friendship to convince Dr. Rahim that the investment was safe and profitable"). Here, Sapp's conduct falls squarely within the conduct that the courts in *Mabrook*, *Pacheco-Martinzez,* and *Burke* found to be an abuse of position of trust.

E.       *Acceptance of Responsibility*

The United States agrees that the defendant has timely accepted responsibility for the offense, meriting a two point reduction under § 3E1.1(a). The defendant assisted authorities in the prosecution of his own misconduct by timely notifying authorities of the intention to enter a plea of guilty. Accordingly, the United States hereby moves for the additional one point reduction under U.S.S.G § 3E1.1(b).

### III.    The Imposition of Sentence

In addition to considering the properly calculated Guidelines range, the Court must also consider the other sentencing factors set forth in 18 U.S.C. § 3553(a). *See, e.g., United States v. Hughes*, 401 F.3d 540, 546 (4th Cir. 2005). In the Government's view, the most pertinent of those factors here are the nature and circumstances of the offenses and the history and characteristics of the Defendant, 18 U.S.C. § 3553(a)(1); the need for the sentence imposed to reflect the seriousness of the offenses, to promote respect for the law, and to provide just punishment for the offenses, *id.* § 3553(a)(2)(A); the need to afford adequate deterrence to criminal conduct, *id.* § 3553(a)(2)(B); the need to protect the public from further crimes of the Defendant, *id.* § 3553(a)(2)(C); and Congress's recent passage of the First Step Act of 2018, which addresses the need to provide educational or vocational training or other corrective treatment for the Defendant, *id.* § 3553(a)(2)(D). In sentencing the defendant, "no limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a

court of the United States may receive and consider for the purpose of imposing an appropriate sentence." 18 U.S.C. § 3661. As argued below, based on the statutory sentencing factors the government seeks a total sentence of **108 months**.

A.    *The Nature and Circumstances of the Offense, and the Personal History and Characteristics of the Defendant*

For over four years the defendant repeatedly defrauded his closest friends and their families by fabricating hundreds of phony real estate transactions; by personally lying to his victims; by falsely reporting non-existent profits; by making Ponzi payments; and by otherwise spending victim money to create an aura of success. In reality, the defendant appears not to have closed a single legitimate deal for his investors. Rather, transaction after transaction, month after month, and year after year, he lied, forged and stole.

Whatever his ultimate business fantasies and the lies he told himself about his "seller-direct" business, his conduct was entirely fraudulent. The defendant did not just make some poor business choices or get in over his head. Rather, he lied from the very start and just kept going. He quickly saw how he could obtain money from his closest friends by a combination of preying on personal relationships and the careful construction of a fake business enterprise, complete with a prospectus, web site, employees, and interlocking fraudulent transactional documents. In reality, the defendant couldn't execute on any of his property flips, and he appears not to have really tried. He was a failure as a real estate investor, but he was skilled with a computer, and he did know how to research the market and how to falsify documents.

Armed with charm and fraudulent documents, and an $80,000 customized Mercedes van, Sapp could roll into Happy Valley, Pennsylvania and present himself to his old friends as a success. His friends, who had real jobs and families, would be the ones to fund Sapp's business fantasies and lavish lifestyle. All one has to do is look at **Exhibit 4** to see what mattered most to the

defendant: having the biggest tailgate party at his old alma mater (from which he actually failed to graduate). That it also helped recruit additional victims whose money would fund more tailgating and golf trips, so much the better. The defendant's conduct with his victims was truly brazen. The depth of the defendant's wilfulness and criminality needs to be reckoned with at the Sentencing Hearing. The defendant lived this fraud scheme as his full-time vocation for at least four years, inflicting horrible consequences on those closest to him.

      B.      *The need to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment for the offense, and to afford adequate deterrence to criminal conduct*

This is a serious offense – really a series of offenses, literally hundreds of wire frauds and identity thefts stretching over many years – that has left dozens of families financially and emotionally devastated. In many cases, the defendant had been an important part of the victims' lives for decades. One can only imagine that victims like D.K. and R.N. and others will have to contend not only with the fall-out of being victims of Sapp's fraud for years, but decades of previous memories and perhaps hundreds of photographs will now be forever tainted by the defendant's abuse of trust and betrayal. Since the consequences will continue for the victims for many years to come, Sapp himself should certainly spend some of those years in federal custody, as just punishment for his offenses. In many respects, this case is *worse* than some blue collar cases. *See, e.g., United States v. Prosperi*, 686 F.3d 32, 47 (1st Cir. 2012) ("It is impermissible for a court to impose a lighter sentence on a white-collar defendant than on blue-collar defendants because it reasons that white-collar defendants suffer greater reputational harm or have more to lose by conviction.").

A significant sentence of jail time for the defendant is also necessary to promote general deterrence and respect for the law. Others must see that such brazen fraud affecting so many victims so profoundly carries a significant custodial sentence. *See United States v. Hefferman*, 43

F.3d 1144, 1149 (7th Cir. 1994) ("Considerations of (general) deterrence argue for punishing more heavily those offenses that either are lucrative or are difficult to detect and punish, since both attributes go to increase the expected benefits of a crime and hence the punishment required to deter it.").

     C.     *The Need for Specific Deterrence*

A lengthy term in federal custody is necessary to incapacitate Sapp and to deter him from further crimes. Sapp is only 38 years old today. He has spent the better part of his thirties engaged in a sophisticated fraud scheme, effectively making it his way of life. He is the type of defendant who poses a serious risk for recidivism, given his relatively young age, and his history and characteristics. Leading a double life for so long, betraying so many close friends, and doing it so skilfully, all speak to the depth of the defendant's criminality, his egotism, and his disregard for others, for community standards, and for the law.

With the benefit of hindsight, some victims have called the defendant a sociopath. It is hard to say they are wrong. Clearly, the defendant has an amazing gift for cultivating people and endearing himself to them, even to an extreme degree. That Sapp would so callously abuse those relationships, and do it for so long and so unflinchingly, does not bode well for his recidivism and his future as a law-abiding member of society. That is why a total sentence of nine years makes sense in this case.

Since he has been caught, the defendant affects to be sorry for his crimes and says he wants to repay his victims. But it is the defendant's actions that are most telling, not his words. If the defendant really had wanted to repay the victims of the offense, he would not have disregarded the FBI's admonition not to sell the $80,000 Mercedes van after the scheme had already unravelled. He went ahead and did it anyway, knowing it had been purchased with investor funds. Some of that money could have gone to the victims, as he well knew when he sold the van and dissipated the money. In weighing the defendant's claims of remorse, it is worth asking the following

18

question: when the defendant was disposing of the van in May 2018, was he thinking of the $34,000 he'd taken from Victim R.V. who, in 2017, had explained to Sapp that he needed the money for his special needs son, who was born with congenital birth defects? *See* PSR "New Information." Was Sapp thinking of anybody but himself when he was taking R.V.'s money in 2017 and when he sold then van a year later?

Moreover, if Sapp had really been feeling bad and struggling with guilt during the offense, he would not have been pressing victims for referrals up to the very end of the scheme. He would not have taken money from a cancer patient and strung that family along and inflicted mental anguish on the dying man and then asked his widow to double her investment. *See* PSR ¶ 44. Sapp would not have sent D.K. and O.R. screen-shots of fake bank account balances to fend them off as he scrambled to fund new investors. D.K. Victim Impact Statement at p. 2.

There has been no good faith with this defendant and his scheme. There was no actual "seller direct" business that ever generated any income. There were only fake property transactions and lies. This case precisely illustrates why the Fourth Circuit has stated that "[t]he intent to repay eventually is irrelevant to the question of guilt for fraud." *United States v. Allen*, 491 F.3d 178, 186 (4th Cir. 2007) (citation omitted). Likewise, "no amount of honest belief that his corporate enterprise would eventually succeed can excuse the willful misrepresentations by which the investors' funds were obtained. An investor may be defrauded if his reliance is induced by deliberate false statements of fact, and the defendant's optimism as to the future is no defense." *United States v. Curry*, 461 F.3d 452, 458 (4th Cir. 2006). Of course, here there cannot even said to be any "honest belief" in any legitimate business. The defendant simply concocted fantasy business plans and attended wealth-building seminars when he was not busy creating fraudulent documents, tailgating, and golfing.

D.      *The First Step Act of 2018*

Recently, Congress passed the First Step Act of 2018 ("FSA"), which addresses the need identified in 18 U.S.C. § 3553 for the sentence imposed to provide a defendant with educational, vocational, or other corrective treatment.   The Act directs the Bureau of Prisons ("BOP") to provide "appropriate incentives for successful participation and completion of evidence-based recidivism reduction" programs.  18 U.S.C. § 3632(d).  Once the BOP implements the FSA, the Defendant will be able to earn 10 days of credit for every 30 days that he participates in a recidivism reduction or productive activity.  *See* 18 U.S.C. § 3632(d)(4)(A)(i).   If the BOP classifies him as having a low risk of recidivism, he will be able to earn an additional 5 days of credit for every 30 days' participation.  This means that he will be eligible to earn a total of 15 days of credit for every 30 days of participation.

Once the total of the Defendant's credits combined with his 15% reduction for good behaviour equal the remaining portion of his sentence, he will be eligible for transfer to pre-release custody, which means either home confinement or residency in a re-entry center.  *See* 18 U.S.C. §§ 3624(g)(1)(A), (g)(2).  In addition, although any period of home confinement under this statute would be subject to BOP supervision, the BOP will have the authority to transfer the Defendant to supervised release under the Court's supervision when he is serving the last year of his confinement.  *See* 18 U.S.C. § 3624(g)(3).

The goal of the Act is to rehabilitate defendants by providing them with educational and vocational training that will hopefully reduce their risk of recidivism. The incentives and reductions that this Defendant can earn under the Act, however, appear to offer him little he has not already enjoyed.   Given the Defendant's level of education (some college) and his past vocational success (*see* PSR ¶¶ 90-9294-97) , there is little more that this Court or the BOP can do

to provide him with additional educational or vocational training that would either benefit him or reduce his risk of recidivism.  In essence, he would be receiving a reduction in sentence with no appreciable benefit either to himself or to the community.  That is another reason why the sentence should be substantial in this case.

## IV.    Conclusion

For all of the above reasons, the government respectfully requests that this Court impose a sentence of imprisonment of **108 months: 84 months on Count 1,** to be followed by **a consecutive term of 24 months on Count 2**.  This sentence is necessary and appropriate in this case to sufficiently address the nature and circumstances of the offenses and the history and characteristics of the defendant; to reflect the seriousness of the offenses, to promote respect for the law, and to provide just punishment for the offenses; to protect the public from further crimes of the defendant; and to satisfy the other sentencing purposes set forth in 18 U.S.C. § 3553. The government also seeks orders of restitution and forfeiture.[4]

Respectfully submitted,

G. Zachary Terwilliger
United States Attorney


_____/s/_____
Russell L. Carlberg
Counsel for the United States
United States Attorney's Office
2100 Jamieson Avenue
Alexandria, VA 22314
Telephone:  703-299-3700

---

[4] The defendant agreed to forfeiture and restitution as part of his plea agreement. *See* PSR ¶¶ 3-4. Moreover, forfeiture and restitution are both mandatory in this case. The Government has prepared preliminary forfeiture and restitution orders, attached here as proposed orders, and will ask that the Court enter those orders as part of its judgment at sentencing because the government has proven the amounts at issue by a preponderance of the evidence.

**CERTIFICATE OF SERVICE**

I certify that on this 8th day of March 2019, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF System, which will send notice of such filing to counsel of record.

_____/s/_____

Russell L. Carlberg
Special Assistant United States Attorney LT
United States Attorney's Office
Justin W. Williams U.S. Attorney's Building
2100 Jamieson Avenue
Alexandria, Virginia 22314
Phone:  (703) 299-3700
Fax:  (703) 299-3982
Russell.L.Carlberg@usdoj.gov